## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DUSTIN E. PETERS,** | ) | |
| Plaintiff | ) | Civil Action No. 2:22cv00017 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | By: PAMELA MEADE SARGENT |
| **Acting Commissioner of Social** | ) | United States Magistrate Judge |
| **Security,** | ) | |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Dustin E. Peters, ("Peters"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

-1-

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Peters protectively filed his application for DIB on April 20, 2020, alleging disability as of March 23, 2020, based on a club foot; back, ankle and joint problems; carpal tunnel syndrome; arthritis in his elbows, knees and ankles; heart problems; and hip and leg pain. (Record, ("R."), at 15, 74, 165-66, 194.) The claim was denied initially and upon reconsideration. (R. at 86-96.) Peters then requested a hearing before an administrative law judge, ("ALJ"). (R. at 97-98.) The ALJ held a hearing on October 1, 2021, at which Peters was represented by counsel. (R. at 33-54.)

By decision dated October 13, 2021, the ALJ denied Peters's claim. (R. at 15-26.) The ALJ found Peters would meet the nondisability insured status requirements of the Act for DIB purposes through December 31, 2025. (R. at 17.) The ALJ found Peters had not engaged in substantial gainful activity since March 23, 2020,[1] the alleged onset date. (R. at 17.) The ALJ determined that Peters had severe impairments, namely, history of club foot arthritis; degenerative disc disease of the lumbar spine; cervicalgia; obesity; history of carpal tunnel with release surgery; irritable bowel syndrome; degenerative joint disease of the hips; a groin injury; and possible sleep apnea, but he found Peters did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.)

---

[1] Therefore, Peters must show he was disabled between March 23, 2020, the alleged onset date, and October 13, 2021, the date of the ALJ's decision, to be eligible for benefits.

-2-

The ALJ found that Peters had the residual functional capacity to perform sedentary work,[2] except he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he could frequently handle and finger; he could have occasional exposure to vibrations, pulmonary irritants and other hazards, such as hazardous machinery, but no exposure to unprotected heights; and he required access to a restroom on regular breaks. (R. at 19.) The ALJ found that Peters was unable to perform his past relevant work. (R. at 24.) Based on Peters's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Peters could perform, including the jobs of an addressing clerk, an assembler and a food checker.  (R. at 25-26, 51.) Thus, the ALJ concluded that Peters was not under a disability as defined by the Act from March 23, 2020, through the date of the decision, and he was not eligible for DIB benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2022).

After the ALJ issued his decision, Peters pursued his administrative appeals, (R. at 278), but the Appeals Council denied his request for review. (R. at 1-5.) Peters then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Peters's motion for summary judgment filed January 30, 2023, and the Commissioner's motion for summary judgment filed March 28, 2023.

---

[2] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2022).

*II. Facts*

Peters was born in 1986, (R. at 25, 165), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Peters obtained a general educational development, ("GED"), diploma and has past work experience as a miner I; a shuttle car operator; a roustabout; a scraper/loader operator; an order picker; a roof bolter; and a heavy equipment operator. (R. at 38-40, 50.) Peters testified that he took hydrocodone and gabapentin for pain. (R. at 42.) He stated he could sit, stand and walk up to 15 minutes each without interruption. (R. at 43-44.) Peters stated his right leg was one and one-quarter inch shorter than his left leg. (R. at 45.) He stated he wore a brace on his right ankle, as he had no movement in his right ankle. (R. at 44-45.) Peters stated he experienced pain, numbness and tingling in both feet at all times. (R. at 45.) He stated he did not have good balance due to his leg discrepancy and having no ability to move it. (R. at 45.) Peters stated he did not receive any long-term benefit from the injections he received for his back pain. (R. at 46.) Peters stated he had carpal tunnel surgery on both wrists, and at the time of surgery, he had ganglion cysts removed. (R. at 47.) He stated he continued to experience numbness and tingling in his hands. (R. at 47.) Peters stated he suffered with irritable bowel syndrome and experienced severe cramps in his lower abdomen that extended into his back area. (R. at 48.) He stated he had to use the restroom up to three times in an eight-hour workday for up to 15 minutes at a time. (R. at 48.)

In rendering his decision, the ALJ reviewed records from Dr. Jack Hutcheson, M.D., a state agency physician; Dr. Daniel Camden, M.D., a state agency physician; Renaissance Surgery Center; Holston Medical Group; Kingsport Urology Group, P.C.; University of Virginia Health System, ("UVA"); Ballad Health Neurosurgery

and Spine; Bristol Surgical Associates, P.C.; Dr. Joseph W. Frye, D.O.; and Wellmont Medical Associates.

Peters has a history of clubfoot deformity of his right foot, which was surgically corrected when he was a child. (R. at 286.) He continued to have issues with his right foot, and he tried shoe and activity modifications, as well as multiple orthotics, bracing and custom inserts with minimal relief. (R. at 733, 784.) In 2009, Peters was involved in a motor vehicle accident and developed persistent low back pain with left lower extremity pain. (R. at 820.) In 2010, Peters underwent a left L5 bilateral laminectomy, L5-S1 medial facetectomies and bilateral L5-S1 foraminotomies. (R. at 820, 825-27.)

On February 18, 2020, Peters saw Dr. Jared Gremillion, D.P.M., a podiatrist with Holston Medical Group, reporting right foot and ankle pain. (R. at 286.) X-rays of Peters's right ankle showed severely hypoplastic talus with os trigonum; extreme blunting of the talar dome; and subchondral sclerosis and periarticular osteophyte formation at the talonavicular joint. (R. at 287.) Dr. Gremillion reported that Peters walked with antalgic gait; he had significantly limited range of motion of his right ankle and subtalar joint, which was painful throughout; he had lower extremity atrophy in comparison to the contralateral limb; and he had normal strength and sensation.[3] (R. at 287.) Dr. Gremillion diagnosed acute right ankle pain; osteoarthritis of the right ankle and foot; lower limb length difference; and status post correction of clubfoot. (R. at 287.) Dr. Gremillion prescribed a custom ankle

---

[3] Dr. Germillion's examination findings remained unchanged at subsequent visits. (R. at 338, 494.)

foot orthosis to be worn during all weight-bearing activities and noted that Peters was too young for a total ankle replacement. (R. at 288.)

On March 3, 2020, Peters saw Dr. Ashraf Youssef, M.D., a physician with Holston Medical Group, reporting bilateral hand pain, numbness and tingling. (R. at 281.) Dr. Youssef diagnosed bilateral carpal tunnel syndrome, and, on June 4, 2020, Peters underwent right carpal tunnel release. (R. at 282, 360-63.)

On March 13, 2020, Peters was seen by Angie Millican, N.P., a nurse practitioner at Holston Medical Group, for a work-related groin injury. (R. at 620.) On examination, Peters had no masses, lumps or swelling of the testicles but he had some tenderness with palpation around the inguinal ligament. (R. at 621.) Peters was diagnosed with strain of the left groin. (R. at 621.) It was recommended that Peters apply heat to the groin area; avoid lifting items weighing over 10 pounds; and avoid bending, stooping and pushing/pulling. (R. at 621.) Millican opined Peter could return to full duty on March 23, 2020. (R. at 621.) On April 13, 2020, Peters continued to complain of groin pain with activity. (R. at 617.) His examination findings remained unchanged, and he was advised to avoid lifting items weighing over 10 pounds; and avoid bending, stooping and pushing/pulling. (R. at 618.) On April 14, 2020, a CT scan of Peters's abdomen and pelvis was unremarkable. (R. at 615.) That same day, an ultrasound of Peters's scrotum showed trace bilateral hydroceles.[4] (R. at 616.)

---

[4] Hydrocele is a type of swelling in the scrotum. *See* https://www.mayoclinic.org/diseases-conditions/hydrocele/symptoms-causes/syc-20363969 (last visited Nov. 29, 2023).

On April 21, 2020, Peters was treated by Dr. Jennifer Phemister, M.D., a gastroenterologist with Holston Medical Group, for complaints of lower abdominal pain, blood in his stool and uncontrolled reflux. (R. at 328.) He reported medication improved his abdominal pain and gastroesophageal reflux disease, ("GERD"). (R. at 328.) A CT scan of Peters's abdomen revealed a fatty liver with no focal liver lesions; a colonoscopy revealed hemorrhoids; and an ultrasound of his gallbladder showed a fatty liver and minimal gallbladder sludge. (R. at 307-08, 331, 368-69.) Dr. Phemister diagnosed GERD; irritable bowel syndrome with diarrhea; rectal bleeding; and abdominal pain. (R. at 331-32.) On June 8, 2020, Peters reported his reflux was better on medication, and he had only occasional left lower quadrant pain. (R. at 454.)

On June 10, 2020, Peters saw Dr. Robert H. Blanton, M.D., a physician with Bristol Surgical Associates, P.C., reporting left groin pain. (R. at 600.) He stated the pain occurred with daily activities, exercise and running. (R. at 600.) Peters denied back and joint pain, swelling, stiffness and muscle pain and weakness. (R. at 601.) He had left groin tenderness along the spermatic cord towards the external ring and some weakness of the inguinal area, and his left testicle had mild tenderness. (R. at 602.) Dr. Blanton diagnosed groin strain. (R. at 602.) On June 24, 2020, Peters reported his groin discomfort resolved with walking, but was painful with heavy lifting maneuvers and when his thigh pressed on the left testicle. (R. at 604.) Dr. Blanton suspected possible compression induced testicular pain and referred Peters to a urologist. (R. at 604.)

On September 16, 2020, Peters saw Dr. Youssef, and reported that his right hand pain and numbness had resolved, but he stated he had weakness in his right

hand and often dropped items. (R. at 380.) Peters had intact sensation in all digits; he had a negative Tinel's sign over the carpal tunnel; he had a minimally positive Tinel's sign over the cubital tunnel; he had full range of motion of all digits; and he had tenderness to palpation over the medial epicondyle. (R. at 380.) Dr. Youssef diagnosed right hand weakness. (R. at 380.)

On September 29, 2020, Peters saw Robert Rutherford, N.P.-C., a certified nurse practitioner at Holston Medical Group, reporting right ankle and foot pain, and he exhibited decreased range of motion of his right ankle. (R. at 398, 400.) However, his gait was normal; he had no joint swelling or instability; and his muscle strength and tone were intact. (R. at 400.) Peters reported his abdominal pain and diarrhea were stable. (R. at 398.) Peters was diagnosed with osteoarthritis of the right foot and ankle; right foot pain; status-post correction of clubfoot; irritable bowel syndrome with diarrhea; and GERD. (R. at 400-01.)

On November 30, 2020, Dr. Kurt A. Ick, M.D., a urologist with Kingsport Urology Group, P.C., evaluated Peters for left-sided testicular pain. (R. at 545.) Peters stated the pain was exacerbated with strenuous activity. (R. at 545.) His examination findings were unremarkable. (R. at 545.) Dr. Ick noted that an ultrasound of Peters's scrotum showed bilateral hydroceles, but he could not palpate significant hydroceles on examination. (R. at 545, 548.) Dr. Ick diagnosed chronic left-sided orchialgia and recommended nonsteroidal anti-inflammatories and heat. (R. at 545.) He noted Peters had a possible strain in the left inguinal area, which should resolve with time, and a slightly enlarged prostate. (R. at 545.)

On December 2, 2020, Peters saw Dr. Youssef, reporting persistent weakness in his right hand and tingling in his fingers, but he denied numbness. (R. at 489.) He stated his strength was returning. (R. at 489.) Peters had intact sensation in all digits; he had a negative Tinel's sign over the carpal tunnel; he had a positive Tinel's sign over the cubital tunnel; and he had full grip strength. (R. at 489.) He was advised to avoid prolonged elbow flexion. (R. at 489.)

On December 9, 2020, Peters saw Brian Scardo, P.A., a physician's assistant with Holston Medical Group, reporting bilateral hip and knee pain. (R. at 484.) On examination, Peters's knees exhibited normal range of motion with no swelling, erythema or ecchymosis; and his hips were tender to palpation and had diminished strength and positive FABER testing. (R. at 484.) X-rays of Peters's bilateral knees showed lateral tilt of both patellas. (R. at 484.) X-rays of Peters's bilateral hips showed shortening of the femoral neck, a cam and pincer deformity and no significant degenerative changes. (R. at 484.) Scardo diagnosed bilateral trochanteric bursitis; bilateral patellar maltracking; and bilateral hip weakness. (R. at 484.) Peters received cortisone injections to both hips. (R. at 484.)

On December 10, 2020, a CT scan of Peters's right foot showed osseous calcaneonavicular coalition with secondary mild hindfoot degenerative changes and a large trigonum, contributing to a posterior impingement. (R. at 498.)

On December 16, 2020, Rutherford reported Peters's abdomen had normal bowel sounds with no tenderness or masses; he had a normal gait; he had no joint swelling or joint instability; he had normal movements of all extremities; he had normal muscle strength and tone; he had decreased range of motion of his right

ankle; his deep tendon reflexes were 2+ and symmetric; and he had normal sensation. (R. at 515.) X-rays of Peters's thoracolumbar spine showed a laminectomy at the L5-S1 level and mild disc space narrowing at the L4-L5 and L5-S1 levels. (R. at 662.)

On October 26, 2020, Dr. Jack Hutcheson, M.D., a state agency physician, completed a medical assessment, finding Peters could perform light[5] work. (R. at 65-68.) He found Peters could stand, walk and sit six hours each in an eight-hour workday; occasionally use foot controls with his right lower extremity; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; he had an unlimited ability to balance; and he would need to avoid concentrated exposure to vibration. (R. at 66-67.) Dr. Hutcheson based his findings on Peters's combination of impairments, including a history of clubfoot with correction as a child; mild degenerative disc disease; carpal tunnel syndrome; acid reflux; irritable bowel syndrome; and fatty liver. (R. at 67.) He noted Peters's activities of daily living indicated he handled his personal care; picked up around the house; enjoyed playing with his children; spending time outside; and driving. (R. at 67.)

On November 19, 2020, a nerve conduction velocity, ("NCV"), study and electromyography, ("EMG"), were normal. (R. at 500-03.)

On January 22, 2021, Dr. Daniel Camden, M.D., a state agency physician, completed a medical assessment, finding Peters could perform light work. (R. at 76-

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2022).

78.) He found Peters could stand and/or walk two hours in an eight-hour workday and sit six hours in an eight-hour workday; he could no use foot controls with his right lower extremity; and he could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 77-78.) Dr. Camden indicated no manipulative, visual, communicative or environmental limitations. (R. at 78.) Dr. Camden noted that, based on Peters's abnormal right foot/ankle findings, it would be more appropriate to limit him to sedentary work. (R. at 78.) He noted that, because of Peters's carpal tunnel syndrome and former back surgery, Peters should lift items weighing no more than 20 pounds. (R. at 78.) Dr. Camden noted that Peters reported on his activities of daily living form that he could walk about a half of a mile suggesting he would be capable of sedentary stand/walk demands. (R. at 78, 207.)

On February 24, 2021, Peters was seen at UVA for complaints of bilateral foot pain and right ankle pain. (R. at 732-50.) Peters had diminished ankle and hindfoot range of motion; his motor strength was intact; he had tenderness to palpation over the anterior and lateral ankle and hindfoot; he had intact sensation; his pulses and capillary refill were normal; and he had no instability. (R. at 734.) X-rays of Peters's bilateral feet and ankles showed right talus deformity and significant degenerative changes at the ankle and hindfoot. (R. at 734.) A CT scan of Peters's right foot showed congenital deformity of the talus with ankle arthritis, complete calc-navicular coalition. (R. at 734.) Peters was diagnosed with right significant ankle and hindfoot arthritis. (R. at 734.) Although surgical options were discussed, Peters opted to wait on proceeding with surgery. (R. at 735.) He was advised he could continue activity as tolerated. (R. at 734.)

Worker

On March 30, 2021, Peters underwent a sleep apnea study,[6] which showed primary snoring; periodic limb movements in sleep; obesity; abnormal sleep architecture-delayed sleep onset; reduced sleep efficiency; reduced rapid eye movement sleep latency; and hypersomnia. (R. at 645-47.)

On April 9, 2021, Peters saw Dr. Jonathan Blankenship, D.O., a physician with Holston Medical Group, reporting back pain after lifting a 10-pound sack of feed the previous day. (R at 697.) X-rays of Peters's lumbar spine were normal. (R. at 700.) Peters had decreased length of stride due to pain; he had decreased strength, bilaterally; he had intact sensation; and he had positive straight leg raising tests, bilaterally. (R. at 701.) Dr. Blankenship diagnosed neuropathy; radiculopathy; decreased strength; and low back pain. (R. at 701.) On April 14, 2021, an MRI of Peters's lumbar spine showed a laminectomy at the L5-S1 level; mild disc narrowing at the L4-L5 and L5-S1 levels; and no acute fracture. (R. at 660-61.) On April 20, 2021, Peters saw Rutherford, reporting low back pain and swelling in his right hand. (R. at 689.) Peters had a normal gait; he had no joint swelling; he had normal movements of all extremities; he had normal muscle strength and tone; he had no involuntary movements; his right hand had mild dorsal swelling; his deep tendon reflexes were 2+ and symmetric; and he had normal sensation. (R. at 692.) X-rays of Peters's right wrist showed a remote ulnar styloid fracture, and x-rays of his right hand were normal. (R. at 657-58, 692.)

On July 19, 2021, Peters saw Elisabeth J. Lowe, F.N.P., a family nurse practitioner with Wellmont Medical Associates, reporting back and leg pain. (R. at

---

[6] On February 9, 2021, Peters underwent a home sleep study, which showed snoring – rule out obstructive sleep apnea; obesity; nocturnal hypoxemia; and hypersomnia. (R. at 654-56.)

577.) He stated his pain was mildly relieved with pain medication, heat, ice baths, massages and a back support brace. (R. at 577.) Peters reported occasional balance instability. (R. at 577.) Peters's gait was antalgic, but he did not use an assistive device; he was moderately tender to palpation in the thoracic spine, but he had normal spinal range of motion; his straight leg raising tests were negative; he had normal range of motion in all extremities; he had mild sacroiliac, ("SI"), joint tenderness on the left; his Patrick's maneuver was positive, bilaterally; he had mild trochanteric bursa tenderness; he had normal muscle bulk and tone; he had normal sensations and reflexes; and he had decreased range of motion in the right ankle due to clubfoot. (R. at 580.) He was diagnosed with back pain and prescribed a series of lumbar epidural steroid injections. (R. at 581.) Peters was offered physical therapy, but he declined. (R. at 581.)

On August 2, 2021, Peters saw Dr. Joseph W. Frye, D.O., reporting back pain that radiated into his bilateral lower extremities. (R. at 566.) He reported he was able to walk for exercise, perform self-care activities, do household chores and shop, but he was unable to do yard work. (R. at 568.) On examination, Peters's gait was intact; he had tenderness in his lumbar spine; and he had normal muscle bulk, tone and strength. (R. at 569-70.) Peters was diagnosed with back pain, bilateral leg pain, lumbar radiculopathy and degeneration of the lumbar intervertebral disc. (R. at 570.) A lumbar epidural steroid injection was administered. (R. at 571.)

On August 27, 2021, Peters saw Scardo, reporting bilateral ankle pain. (R. at 767.) Peters had tenderness to palpation along the mortise, bilaterally; he had mild dorsal and lateral swelling; and pain with passive range of motion and inversion. (R. at 767.) X-rays of Peters's cervical spine showed mild multi-level uncovertebral

-13-

joint degeneration. (R. at 783.) He received bilateral ankle injections. (R. at 768.) Scardo recommended Tylenol, ibuprofen and ice for pain. (R. at 768.)

On September 20, 2021, Ashlee Fleming, N.P.-C., a certified nurse practitioner with Holston Medical Group, noted that Peters's gallbladder had been removed in February 2021. (R. at 581-84), and his GERD and diarrhea were doing well with his current treatment. (R. at 858-59.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist

in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Peters filed his application in April 2020; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[7] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. § 404.1520c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b),

---

[7] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

(c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[8] *See* 20 C.F.R. § 404.1520c(b)(2).

---

[8] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2022).

Peters's sole argument on appeal is that the ALJ erred by failing to give appropriate credence to his testimony and properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.)

Peters argues that his testimony that he suffers from severe and chronic daily pain, making it impossible for him to sit, stand, walk or concentrate for prolonged periods, is supported by the objective medical evidence and his continued treatment for chronic pain. Peters argues that the ALJ failed to properly consider his testimony. Contrary to Peters's argument, the Commissioner contends that substantial evidence supports the ALJ's finding that Peters's allegations of disabling chronic back pain are not entirely consistent with the medical and other evidence of record. As the Commissioner stated in her brief, apart from his hearing testimony, Peters did not cite to record evidence that would support further limitations or otherwise undermine the ALJ's decision.

The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 404.1529 and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[9] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[10] presents a "medically determinable

---

[9] "Symptoms" are defined in the regulations as a claimant's own description of his medical impairment. *See* 20 C.F.R. § 404.1502(i) (2022).

[10] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2) (2022).

impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 404.1529(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts

between [the claimant's] statements and the rest of the evidence, including [his medical] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4) (2022). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ stated as follows in his decision:

… [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.

… In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable … impairment(s) … that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying … impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 19.) In his decision, the ALJ found that the objective findings did not corroborate the allegations to the disabling extent as asserted by Peters. (R. at 22.) The ALJ noted the facts in the record did not dispute that Peters had conditions, which singly or in combination, may cause him pain or difficulty. (R. at 22.) He further noted that the evidence suggested that Peters's symptoms "may not exist at the level of severity" assumed by his hearing testimony and "may have other mitigating factors" against their negative impact on his ability to engage in work activity. (R. at 22.) The ALJ noted that his residual functional capacity finding gave adequate weight to Peters's complaints, as determined to be consistent with the evidence. (R. at 22.) He noted that, although Peters had received treatment for the allegedly disabling impairments, that treatment had been essentially routine, conservative and successful. (R. at 22.) The ALJ found the objective medical evidence, including diagnostic imaging, testing and physical examination results showed mild or no abnormalities. (R. at 22.) He found that, although the record showed Peters had some abnormalities, they were accommodated by his residual functional capacity finding. (R. at 23.)

Thus, the ALJ explicitly set out the appropriate, two-step legal framework for considering Peters's allegations of pain in his decision. After stating the framework, the ALJ recited Peters's testimony that he suffered from pain of the back, feet and ankles; numbness in his hands with poor range of motion; cysts on his wrists; poor balance; irritable bowel syndrome with cramps, diarrhea and frequent trips to the restroom; and obstructive sleep apnea, but denied the use of a continuous positive airway pressure, ("CPAP") machine. (R. at 19.)

The ALJ next turned to an analysis of Peters's symptoms, stating, in part, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 19.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Peters's allegations about his symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether he correctly analyzed Peters's pain under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 19.) To support this finding, the ALJ noted that, during the relevant period, except for his carpal tunnel release surgery, Peters required only routine and conservative treatment, which, for the most part, successfully controlled his symptoms. (R. at 22.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). The ALJ noted that Peters's treatment consisted largely of routine follow-up appointments, during which his providers recommended medication, injections, orthopedic shoe inserts, bracing and activity modification. (R. at 22.) Although Peters required right carpal tunnel release surgery, he reported that the surgery successfully relieved his right arm pain and numbness. (R. at 22.)

The ALJ also considered the results of objective and physical examinations, noting that their results were not commensurate to Peters's reported symptoms and limitations. (R. at 22-23.) The ALJ acknowledged that pain and symptoms are not

always accompanied by objective evidence and that he did not disregard any of Peters's subjective complaints solely due to a lack of objective evidence. (R. at 22.) However, he considered the objective medical findings as one useful indicator in making reasonable conclusions about the intensity and persistence of Peters's symptoms. (R. at 22.)

The ALJ noted that the objective medical evidence, including diagnostic imaging, testing and physical examinations showed mild or no abnormalities. (R. at 22.) Regarding Peters's irritable bowel syndrome, the ALJ noted that testing of his abdomen revealed normal findings, apart from some gallbladder sludge. (R. at 22-23.) Furthermore, Peters reported improvement with his bowel symptoms with routine follow-up appointments and medication. (R. at 22.) *See Gross*, 785 F.2d at 1166. Regarding Peters's ankle impairment, the ALJ noted that records from 2020 showed that he occasionally had an antalgic gait with limited range of motion of his right ankle and atrophy of his right lower extremity. (R. at 23.) However, later in 2020, although Peters had decreased range of motion of the ankle, he had a normal gait and normal movements without diminished strength. (R. at 23.) Regarding Peters's back impairment, the ALJ noted that, in 2021, Peters had normal range of motion in all extremities and negative straight leg raise testing. (R. at 23.) He noted Peters's spine regularly had normal muscle bulk, tone, strength and sensation. (R. at 23.) Regarding Peters's carpal tunnel, the ALJ noted that Peters had numerous abnormalities of the wrist, but following surgery, NCV testing showed no evidence of bilateral median nerve or ulnar nerve entrapment or any radiculopathy, myopathy or plexopathy. (R. at 23.)

Based on the record evidence, the ALJ found that Peters's symptoms "may not exist at the level of severity assumed by [Peters's] testimony at the hearing and may have other mitigating factors against their negative impact on [Peters's] ability to engage in work activity." (R. at 22.) In making his residual functional capacity finding, the ALJ found the opinion of the reviewing state agency physician, Dr. Camden, persuasive, as he cited specific evidence in support of his opinion. (R. at 24.) The ALJ also found that Dr. Camden's opinion was consistent with the record, which supported a sedentary residual functional capacity. (R. at 24.) The ALJ further noted that he found Peters to be more limited than as opined by Dr. Camden, based, in part, on Peters's "subjective allegations of pain at the hearing." (R. at 24.) While Dr. Camden found that Peters could perform light exertion and had no manipulative or environmental limitations, the ALJ found that Peters was limited to only sedentary exertion with frequent handling and fingering and only occasional exposure to vibrations, pulmonary irritants and other hazards. (R. at 19.) To account for the symptoms of Peters's irritable bowel syndrome, the ALJ also added a provision for access to a restroom on regular breaks. (R. at 19.) The ALJ noted that his residual functional capacity finding "gives adequate weight to [Peters's] complaints as determined to be consistent with the evidence." (R. at 22.)

For all the above-stated reasons, I find that the ALJ did not improperly disregard Peters's statements about his pain. To the contrary, the ALJ thoroughly considered such statements and credited them to the extent they were consistent with the record as a whole. As stated herein, in making the determination at the second prong of the symptom evaluation framework, the ALJ must examine the entire case record, including the objective medical evidence, the claimant's statements about the intensity, persistence and limiting effects of his symptoms, statements and other

information provided by medical sources and other persons and any other relevant evidence in the claimant's record. *See* S.S.R. 16-3p, 2017 WL 5180304, at *4. Here, the ALJ reviewed Peters's relevant medical history and his subjective allegations before finding his statements regarding the severity of his limitations were not entirely credible because they were not fully supported by the objective medical evidence and his treatment history. The ALJ was entitled to find that the objective medical evidence outweighed Peters's subjective statements, and he provided a sufficient rationale for doing so. It is well-supported that a reviewing court gives great weight to an ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence of record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Here, the ALJ's decision was thorough and applied the proper legal standard, and this court will not reweigh the evidence.

For all the foregoing reasons, I find that the ALJ's evaluation of Peters's pain was based on a correct legal standard and is supported by substantial evidence. Based on the same evidence stated above, I further find that substantial evidence supports the ALJ's residual functional capacity finding and ultimate finding that Peters was not disabled under the Act and not entitled to benefits.

DATED:      November 29, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE